**TEXARKANA MEMORIAL HOSPITAL, INC., d/b/a Wadley Regional Medical Center, Petitioner,**

v.

**Kathy MURDOCK, individually, and Sheryl Burgess, as administratrix of the estate of Jessie Taylor Andrew Burgess, deceased, and the Arkansas Department of Human Services, Division of Economic and Medical Services, Respondents.**

No. 95–1073.

Supreme Court of Texas.

Argued Oct. 1, 1996.

Decided April 25, 1997.

Rehearing Overruled July 9, 1997.

John R. Mercy, Christy Paddock, Texarkana, for Petitioner.

David Grant Kaiser, Houston, M. Mark Lesher, Texarkana, Rockne W. Onstad, Austin, for Respondents.

GONZALEZ, Judge.

This is a medical malpractice action brought against Wadley Regional Medical Center ("Wadley") by the mother of a deceased child. The Arkansas Department of Human Services ("ADHS") intervened to recover funds which it paid for medical expenses on behalf of the mother as a Medicaid recipient. The trial court rendered judgment for the child's estate, but ordered that ADHS recover its medical expenses paid, and ordered that the mother take nothing. With one justice dissenting, the court of appeals affirmed but modified the judgment so that the mother could recover the difference between the jury's award for medical expenses and the money awarded to ADHS. 903 S.W.2d 868. Because there is no evidence to support the entire amount of damages awarded by the jury, but there is legally sufficient evidence that Wadley's negligence caused some of the medical expenses, we reverse the judgment of the court of appeals and remand this cause for a new trial.

I.

Kathy Murdock entered Wadley Hospital on January 21, 1991 while in labor, and was placed in a room attended by Dr. Thomas Wilson. In 1989, Murdock had given birth to a baby with severe congenital defects which eventually caused the baby's death. Tests conducted during her second pregnancy revealed that this baby might also have similar congenital problems. Early on the morning of January 22, 1991, Murdock gave birth to Jessie Burgess. As feared, the baby was born with certain abnormalities. The evidence showed that prenatal tests on Jessie revealed the following: absence of a part of his brain, the corpus callosum; absence of the cingulate gyrus; hypoplasia, or arrested development of the cerebellum and brain stem, which control balance, breathing, and heartbeat; and the presence of a cystic structure in the skull. Observations after the baby's birth revealed dysmorphic facial features such as a prominent forehead; anteverted nares, or outward-turning nostrils; widely spaced, downward slanting palpebral fissures; and an abnormally small chin. There was also evidence of an enlarged liver, small underdeveloped fingernails, and simian creases in the palm.

In addition, Jessie had taken meconium, or the contents of a bowel movement, into his mouth while in utero. Dr. Clark Green attempted to suction the meconium from the baby's throat about eight to ten minutes after birth. That same day, Jessie was transferred to the Arkansas Children's Hospital ("ACH") in Little Rock. Jessie's treatment at ACH continued until March 4, 1991, when he was discharged from the hospital. He was readmitted twice more after complications arose and died at ACH on March 2, 1992. Murdock filed this suit against Wadley alleging negligence and gross negligence in failing to have a policy for proper delivery of a newborn, and in failing to provide the necessary instruments and personnel for resuscitation of newborns who had passed meconium in utero, which proximately caused Jessie's death. ADHS intervened to recover $352,784 for the part of Murdock's medical bills that it had paid. As a condition of Medicaid eligibility, Murdock had assigned to ADHS her right to any judgment that she might obtain from a third party "to the full extent of any amount which may be paid by Medicaid" on her behalf. Ark.Code Ann. § 20–77–307 (Michie 1991). The jury found that Wadley was negligent and that its negligence was a proximate cause of the injury to Jessie. The jury awarded $250,000 to Jessie's estate, which is not at issue in this appeal, and $500,000 to Murdock to compensate her for Jessie's medical expenses. The trial court rendered judgment for Jessie's estate for $250,000, but ordered that ADHS recover $352,784 for medical expenses paid, and ordered that Kathy Murdock take nothing. The court of appeals affirmed but modified the judgment so that Murdock could recover the $147,216 difference between the jury's award of $500,000 for medical expenses and the $352,784 awarded to ADHS. On appeal to this Court, Wadley contends that the court of appeals erred in affirming the judgment for ADHS for the principal amount of $352,784 and in modifying the judgment to allow Murdock's recovery because there is no evidence of a direct causal link between the amount of medical expenses awarded and any injuries caused by Wadley's negligence.

We agree, but because there is some evidence of damages attributable to Wadley's negligence, we remand this cause to the trial court for a new trial.

## II.

The court of appeals found that there was some evidence to support the jury's finding of a causal link between the injuries caused by Wadley's negligence and the $500,000 medical expenses award. 903 S.W.2d at 880. We review no evidence points by considering only the evidence and all reasonable inferences that support the jury finding while disregarding all evidence and inferences to the contrary. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992). If there is more than a scintilla of evidence to support the finding, the no evidence challenge must fail. *Id.* If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex.1995).

■ The parties stipulated that all treatment of Jessie by ACH and all expenses corresponding thereto were reasonable and necessary. However, Wadley expressly reserved whether its acts or omissions proximately caused those treatments and expenses. Therefore, we will examine the evidence to support a causal link between Wadley's negligence and the $500,000 in damages for medical expenses awarded to ADHS and Murdock.

Murdock and ADHS assert that the testimony of plaintiffs' expert Dr. Michael Cardwell, a specialist in obstetrics, gynecology, and fetal-maternal medicine, provides the causal link between Wadley's negligence and the damages in question. Dr. Cardwell testified after his review of the medical records in the case that Wadley's negligence caused Jessie to suffer meconium aspiration syndrome, which in turn caused other adverse conditions. Among the secondary damage attributed to meconium aspiration syndrome were hypoxic ischemic encephalopathy, asphyxiation, and a form of respiratory dependent lung disease.

■ To recover damages, the burden is on the plaintiff to produce evidence from which the jury may reasonably infer that the damages claimed resulted from the defendant's conduct. *Haynes & Boone*, 896 S.W.2d at 181; *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 209 (Tex.1985). A plaintiff satisfies this causal link requirement when it presents the jury with proof that establishes a direct causal connection between the damages awarded, the defendant's actions, and the injury suffered. *Haynes & Boone*, 896 S.W.2d at 181. The only evidence that could be considered to provide the necessary causal link between the meconium aspiration syndrome and its secondary damage (which was caused by Wadley's negligence), and the amount of medical expenses the jury awarded, is the following testimony from Dr. Cardwell:

Q: Okay. Did you, in reviewing the medical records of Arkansas Children's Hospital that are marked and comprise Plaintiff's Exhibit Number Five, did you form an opinion as to whether the treatment that is set forth in there would be necessary to treat the meconium aspiration and the sequelae that you told us about?

Cardwell: Yes, I have an opinion.

Q: And what is your opinion?

Cardwell: In my opinion, the therapeutic maneuvers performed at Arkansas Children's Hospital [are] necessary to treat meconium aspiration syndrome suffered by baby Jessi[e].

Q: Do you feel like the treatment modalities that are described in the records are reasonable efforts to treat the condition that's set forth in those records?

Cardwell: Yes, I feel that the treatments were necessary and reasonable in the circumstances.

Based on this testimony and other evidence, it is indisputable that Wadley's negligence caused some of Jessie's medical expenses. Further testimony from Dr. Cardwell supports the same conclusion:

Q: Now, you say that you have concluded from the fact that the baby stayed on a respirator sixteen days, from that fact

you have concluded that there was a serious aspiration?

Cardwell: It's serious in that—Let me clarify it a little bit. Meconium aspiration syndrome is a serious problem. The sequelae of it can be even serious. In this particular baby, it aspirated meconium. It went without oxygen essentially for eight minutes or more. The meconium aspiration syndrome caused the hypoxic ischemic encephalopathy. Now, that led to the damage of the baby's brain permanently, and eventually led to demise of the baby. Now, the meconium aspiration in the lungs might have cleared, but not the hypoxic ischemic encephalopathy. This is a permanent damage to the central nervous system.

On cross-examination, he testified:

Cardwell: Well, I—not to argue with the doctors in Little Rock, but why did the baby stay on the respirator for sixteen days if it was a mild meconium aspiration syndrome?

Q: Do you think that maybe the baby's small brain stem and the baby's genetic problems with the breathing apparatus may have had something to do with that?

Cardwell: No.

Even Wadley's own expert, Dr. Arrington, testified that some of the damages were caused by the meconium aspiration:

Q: What portion of the treatment that Jessie received at Arkansas Children's in that first hospitalization was, in your judgment, necessitated because of the meconium aspiration?

A: I would say the first twenty-seven hours, plus the transport [to ACH].

Wadley concedes that "this evidence could . . . support a causative link for treatment for the first twenty-seven hours of hospitalization." One of Jessie's treating physicians at Wadley, Dr. Green, provided testimony supporting the conclusion that at least some of the expenses incurred at ACH resulted from the meconium aspiration:

Green: We suctioned a lot [of meconium] out, but there was some concern that there might have been some aspiration, yes.

Q: And based upon that, you transferred the child to [ACH]?

Green: Correct.

Other evidence ties Jessie's first hospitalization at ACH primarily to meconium aspiration syndrome and its complications. The diagnosis listed on the records in Exhibit Five corresponding to the first hospitalization is listed as "Term Newborn/Meconium Aspiration/Agenesis Corpus Callosum." On admittance to ACH, the baby was examined and the chart notes "mild meconium aspiration syndrome." A test performed later that day contains the notation "slight worsening of meconium aspiration syndrome." A chest examination performed on February 6 notes that the condition of the lungs was "consistent with meconium aspiration pneumonia." Again, on February 8, the test notation reads "all of these findings . . . are consistent with meconium aspiration pneumonia." This diagnosis continues until the lungs were found clear and the baby discharged in mid-February. An ACH discharge summary states that Jessie spent two weeks on the ventilator because of meconium aspiration.

Thus, there is legally sufficient evidence directly linking treatments incurred during the first hospitalization solely to the meconium aspiration. Plaintiff's Exhibit 25 shows that the treatment expenses during the first hospitalization at ACH were $66,694.14 between January 22 and February 16, and $19,976.68 between February 17 and March 4. The cost of the ACH ambulance transport on January 22 was $2,022.91. Plaintiff's Exhibit 10 listed the expenses incurred at ACH by hospitalization and treatment period. The cost of the first hospitalization was listed as $88,777.33, which is roughly equivalent to the sum of the amounts listed in Exhibit 25.

However, while this is some evidence of damage caused by Wadley's negligence, a plaintiff may recover only for those injuries

caused by the event made the basis of suit. *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 732 (Tex.1984). The case before us is analogous to other cases where a suit for medical expenses involved another injury or pre-existing condition. In *Hilland v. Arnold,* 856 S.W.2d 240, 242 (Tex.App.—Texarkana 1993, no writ), the court held that an injured party who receives medical treatment may recover only those reasonable medical expenses necessarily incurred because of the injuries suffered in the occurrence involved in the litigation. In *Hilland,* the defendant did not dispute that his negligence caused the collision in which the plaintiff was injured. However, he did dispute the causal link between the accident and medical expenses the plaintiff incurred because there was evidence that a pre-existing condition could have been the reason for some of the treatment. *Id.* In *Kulms v. Jenkins,* 557 S.W.2d 149, 154 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.), the court eliminated the plaintiff's recovery for past medical expenses because there was no evidence detailing which treatment was necessary for conditions brought on by the plaintiff himself and which expenses were necessarily incurred because of the collision the defendant's negligence caused. We agree with the reasoning of these courts on this issue and hold that a plaintiff should recover only for medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant, where such a differentiation is possible.

The acts or omissions that are the basis of this suit are Wadley's failure to properly treat Jessie for meconium aspiration and its effects, and ACH's subsequent treatment of those conditions only. However, Dr. Cardwell's testimony and the other evidence supporting a link to some of the damages do not indicate that the conditions caused by Wadley were the only conditions necessitating treatment at ACH and do not establish that all services rendered there were for meconium aspiration and its effects. There is no evidence that segregates the medical expenses awarded as corresponding to the treatment for conditions the meconium aspiration caused. The context of Dr. Cardwell's testimony is the health problems incurred by

Jessie because of Wadley's negligence. The fact that he did not focus on other reasons for which Jessie may have been treated in the fourteen months leading up to his death does not mean other reasons and corresponding treatment were not present.

Often, patients in hospitals are treated for more than one condition brought on by causes independent of each other. Had there been only one possible condition to be treated at ACH, Dr. Cardwell's testimony about "the therapeutic maneuvers" and "the treatment modalities" would have been sufficient to link the treatment with all of the medical expenses. However, it is undisputed that prenatal ultrasounds and the autopsy revealed a hypoplastic cerebellum, absence of the cingulate gyrus, and agenesis of the corpus callosum. There was more than one condition to be treated, each produced by an independent cause, and sufficient evidence to indicate that treatment for more than one condition occurred. Therefore, it was incumbent upon the plaintiffs to prove which treatments were due to meconium aspiration and its effects, and the specific costs associated with those treatments sufficient to support a jury award of $500,000 for medical expenses. Because they failed to do so, we must reverse. *Cf. Travelers Indem. Co. v. McKillip,* 469 S.W.2d 160, 163 (Tex.1971) (concluding that the evidence supported a finding that an excluded peril caused a part of the plaintiff's loss, and that insureds had to prove and secure jury findings that the damage was caused solely by the insured peril, or segregate the damage caused by the insured peril from that caused by the excluded peril); *Paulson v. Fire Ins. Exch.,* 393 S.W.2d 316, 319 (Tex.1965) (holding that it is essential that an insured produce evidence which affords a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a covered peril).

■ The court of appeals reasoned that because the jury returned a verdict of $500,-000 for medical expenses out of a total bill of $748,710.44, the jury made deductions based on the evidence that indicated that some of the treatment at ACH was caused by Wadley's negligence while some was caused by the birth defects. 903 S.W.2d at 880. How-

ever, it is axiomatic that a jury must have an evidentiary foundation on which to base its findings. The award of past medical expenses is readily capable of measurement by a certain standard. In that sense, medical expenses are unlike more nebulous measures of damages such as pain and suffering where the jury has broad discretion when fixing an amount to award.

Furthermore, medical malpractice actions involve such technical and specialized knowledge that lay jurors generally need medical expert testimony to assist them in evaluating factual evidence. Darrell L. Keith, *Medical Expert Testimony in Texas Medical Malpractice Cases,* 43 Baylor L.Rev. 1, 3 n. 1 (1991) (citing *Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977)). There is no testimony from Dr. Cardwell or any other medical expert that links any dollar amount of the medical expenses charged by ACH with treatment of conditions caused by Wadley. A lay jury cannot be expected to ascertain without guidance from a medical expert which treatment was for meconium aspiration and its effects, and the costs associated with that treatment upon which it could base an award for medical expenses due to Wadley's negligence.

Because of our disposition of the case, we need not reach Wadley's other point of error, which complains that Murdock should not recover the difference between the amount paid by ADHS and the jury award, because under the Arkansas Medicaid Program, she could never be liable for those expenses. This issue is not dispositive of Wadley's appeal.

### III.

We now turn to the proper disposition of this cause. Because Murdock and ADHS presented legally sufficient evidence that some of the medical expenses resulted from the meconium aspiration only, they should be afforded an opportunity to develop this evidence further. As a general rule, "when we sustain a no evidence point of error after a trial on the merits, we render judgment on that point." *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 86 (Tex.1992). However, this case is analogous to *Stewart Title* *Guaranty Co. v. Sterling,* 822 S.W.2d 1, 10–12 (Tex.1991). In *Sterling,* we settled a conflict between courts of appeals on whether a failure to segregate attorney's fees among various claims or parties called for rendering a judgment awarding no attorney's fees at all, or required remand for more evidence on the issue. We held that an award of attorney's fees erroneously based on evidence of unsegregated fees requires a remand. *Id.* at 11; *International Sec. Life Ins. Co. v. Finck,* 496 S.W.2d 544, 546–47 (Tex.1973). We reasoned that "[e]vidence of unsegregated attorney's fees is more than a scintilla of evidence of segregated attorney's fees, i.e. what a reasonable attorney's fee would be for the entire case indicates what the segregated amounts should be." *Sterling,* 822 S.W.2d at 12.

Accordingly, we reverse the judgment of the court of appeals, and we remand this cause to the trial court for a new trial consistent with this opinion.